**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | |
|---|---|
| SANDRA ROY, )<br>    **Plaintiff,** )<br>)<br>V. )<br>)<br>COMMISSIONER OF THE )<br>SOCIAL SECURITY ADMINISTRATION, )<br>    **Defendant.** ) | **NO. 7:07-CV-00124-BF (O)** |

**MEMORANDUM OPINION AND ORDER**

The parties consented to have the United States Magistrate Judge conduct the proceedings in this case, and the District Court transferred this case to the United States Magistrate Judge. Plaintiff, Sandra L. Roy ("Plaintiff"or "Roy"), appeals the decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("Defendant" or "Commissioner"), denying Plaintiff's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments under Titles II and XVI of the Social Security Act (the "Act").

**I.**

Plaintiff applied for benefits effective November 22, 2004. After denials initially and upon reconsideration, Administrative Law Judge ("ALJ") Eleanor T. Moser held a *de novo* hearing on December 11, 2006. On January 26, 2007, the ALJ issued a decision that Plaintiff was not disabled. On June 7, 2007, the Appeals Council declined review, making the ALJ's January 2007 decision the Commissioner's final decision. (Tr. 610-12.) On August 2, 2007, Plaintiff appealed from the Commissioner's June 7, 2007 decision that Plaintiff was not disabled. *See* 42 U.S.C. § 405(g).

Plaintiff was born on August 27, 1964. She has a twelfth-grade education and attended a special education class. Plaintiff was thirty-nine years old on July 15, 2004, when she allegedly became disabled. She was forty years old when she applied for benefits, and forty-two years old at the time of the hearing. For Social Security purposes, Plaintiff was defined as a younger individual. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c) (individual claimant under age 50 considered to be a younger person). Plaintiff's past relevant work includes four exertionally "medium" jobs: dietary aid (unskilled); janitor/housekeeper (unskilled); cook helper (unskilled), and nurse aid (low-level semi-skilled, as performed by Plaintiff).

Plaintiff contends that: (1) the Commissioner's finding with respect to Plaintiff's mental residual functional capacity, and the resulting finding of non-disability, results from reversible legal error; and (2) the Commissioner's finding as to Plaintiff's mental residual functional capacity, and the resulting finding of non-disability, is not supported by substantial evidence. The Commissioner responds that the ALJ did not commit reversible error and that substantial evidence supports the Commissioner's decision that Plaintiff was not disabled.

**II**.

Although Plaintiff also had severe physical disabilities, the relevant medical evidence pertains to Plaintiff's mental impairments after the date she allegedly became disabled. On July 27, 2004, Plaintiff notified her treating psychiatrist, Emory Sobiesk, M.D., that she would be changing to the Helen Farabee Center ("HFC") for psychiatric care because of financial considerations. Plaintiff underwent a psychiatric evaluation by Hector Decena, M.D., of HFC on September 14, 2004. Plaintiff complained that she was easily offended, cried a lot, became upset, was depressed and felt isolated. She reported that she was taking Zyprexa and Effexor, but that she lowered the

2

dosages herself to make the prescriptions last longer. She explained that she had difficulty affording the medications. She said that the medications made her feel better.

Plaintiff's psychiatric history indicated that she hit her head on the roof of her car in 1993. She received treatment for seizures, depression, and was hospitalized after auditory hallucinations and "feeling that people were out to get her." Doctors prescribed antipsychotic and antidepressant medications on an outpatient basis for a recurrence in 1995.

On September 14, 2004, Dr. Decena's examination revealed that Plaintiff's memory was intact, but concentration, insight and judgment were "fair." Dr. Decena diagnosed "Major Depressive Disorder, Recurrent, Severe with Psychotic Features." He continued her medications (Zyprexa, an antipsychotic, and Effexor, an antidepressant), and assigned current and past-year-maximum GAF ratings of 47 and 55 respectively.[1]

When Plaintiff returned to Dr. Decena on October 11, 2004, she was crying and accusing her husband of trying to hurt or disturb her. She claimed she had been taking her Zyprexa and Effexor regularly, and was not able to tell Dr. Decena when she started to decompensate again. Her caseworker came to help calm her down, and Dr. Decena increased the dosage of her Zyprexa, and prescribed Zyprexa Zydis at a small dose during the day to calm her nerves.

On November 8, 2004, Plaintiff returned to Dr. Decena. Her mood was calm, and she was pleasant. She reported that she was doing well, but that she was sleeping about ten or eleven hours

---

[1] The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed.2000) ("DSM-IV-TR") at 32. A GAF score of 51-60 indicates "moderate symptoms," such as a flat affect, or "moderate difficulty in social or occupational functioning." *Id.* at 34. A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Id.*

a day. Dr. Decena told her that sleep was a good anecdote for boredom. She reported that she was thinking about doing volunteer work. She was coherent and relevant, with no psychotic symptoms. Dr. Decena continued her medications.

On March 23, 2005, Plaintiff again saw Dr. Decena. Her Zyprexa had been replaced by Loxitane due to hyperglycemia. Plaintiff showed no remarkable signs and claimed she was no longer depressed and had not been having any psychotic symptoms. Dr. Decena continued her Loxitane and Effexor.

On May 18, 2005, Plaintiff reported to Dr. Decena that she had begun to feel depressed again, and that she did not want to do anything. She said that she had lost interest in activities and preferred to sleep during the day. Dr. Decena noted she was moderately obese with good eye contact but with rather mild mental retardation. Dr. Decena increased her dosage of Effexor.

When Dr. Decena retired, Plaintiff went to Ashokkumar Vachhani, M.D. at HFC. On November 14, 2005, Plaintiff reported that she had some symptoms of depression: loss of interest, lack of motivation, poor concentration, overspending, and some mood swings. She denied any racing thoughts or any other symptoms of bipolar disorder. On mental examination, the doctor noted that she was casually dressed and somewhat slow. Her affect was somewhat blunted, but her thought processes were coherent. Her psychomotor activity was somewhat slow. He found no evidence of hallucinations, suicidality, or homicidality. He again increased Plaintiff's Effexor.

When Plaintiff returned to see Dr. Vachhani on August 25, 2006, she complained of difficulty sleeping. The doctor suggested that caffeine in her soft drinks might be the cause of her sleep problems. She had no other complaints. The mental status examination was unremarkable, and the doctor continued the same medications.

On March 28, 2005, a psychologist acting as a Texas state agency psychological consultant stated that Plaintiff was "markedly limited in the ability to interact appropriately with the general public, and "moderately" limited in the abilities to (1) maintain attention and concentration for extended periods, (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (3) accept instructions and respond appropriately to criticism from supervisors, (4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and (5) respond appropriately to changes in the work setting. On August 11, 2005, another consultant affirmed Dr. Chappious' opinions.

**III**.

Plaintiff, Gary Roy (Plaintiff's husband), and Clifton King (a Vocational Expert ("VE")) testified at the hearing. The ALJ posed an initial hypothetical question to the VE, telling him to consider a person who: "can occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds . . . can stand or walk with normal breaks for a total of six hours in an eight-hour day . . . can sit with normal breaks for a total of six hours in an eight-hour day . . . has unlimited ability to push and pull hand or good controls, has no postural limitation, no manipulative limitations, no visual or communication or environmental limitations . . . has some non-exertional limitations and problems with depression and which [sic] finds its way into fatigue. So she has some moderate limitations in her activities of daily living, social functioning, concentration and pace, and she has had episodes of decompensation, but they seem to be – the two she's had is just once every seven years, so that doesn't seem to be a big problem. Apparently if she's taking her medications and all she has the ability to understand, remember and carry out simple instructions, but not complex instructions. She

can respond appropriately to coworkers and supervisors." (Tr. 26.)

The VE stated that a person the ALJ described could not perform Plaintiff's past job as a nurse's aide, but could do the other three past jobs. The VE added, however, that "When we get into the moderate depression, fatigue and the moderate limitations of daily living and social functioning and concentration, those would have an effect on the maintenance of the jobs, but as far as the performance these are not complex jobs and are not detailed to the [extent] that you would have difficulty I believe." (Tr. 261-62.)

The ALJ posed a second hypothetical question, limiting standing or walking to two hours of an eight-hour workday with normal breaks, and restating the mental limitations as follows: "suffers from non-exertional limitations of fatigue, depression and she has fair concentration and judgment . . . can relate well to others, supervisors, and other coworkers . . . markedly limited in her ability to interact appropriately with the general public." (Tr. 262). The VE stated that the more severe standing/walking limitation would eliminate all Plaintiff's past work, but that a person as described in the second hypothetical question would perform sedentary, unskilled jobs entitled "laminator 1," "stuffer," bonder semiconductors," and "patcher." (Tr. 263.)

Plaintiff's representative questioned the VE about whether the jobs he had identified were "done on a production rate basis." The VE confirmed that they were. (Tr. 263-64.) The representative asked the VE to assume "the same hypothetical individual described here and the Judge found they could do these jobs, but because of her depression she – her production rate is reduced because her concentration problems are in actually getting jobs finished and complete by 25 percent on a consistent basis." (Tr. 264.) The VE stated that the jobs could not be maintained "with that kind of production loss." (*Id*.) The representative then asked the VE to assume "that the

6

same hypothetical individual who because of her depression and psychotic disorders . . . tends to not show up for work two to three times per month on a consistent basis." (*Id*.) The VE replied that: "It would be equally detrimental and you couldn't maintain the jobs." (*Id*.) The representative's final question to the VE was to assume "the same hypothetical individual that has panic attacks, under stress and whatever, and she has to be taken away from the job site . . . once to two times per month on a consistent basis." (*Id*.) The VE stated that: ". . .if you have that on a continual basis it would be significant and I don't think you could maintain." (*Id*.)

Plaintiff testified that she stopped working in July 2004 due to "depression, fatigue, hearing voices" and had been hospitalized twice for psychotic illness, the last time in 2000. (Tr. 231.) She said she has crying spells several times a day, mood swings, and fatigue. (Tr. 233.) Plaintiff was unable to describe what triggered the spells. She claimed she could neither sit and watch TV nor listen to the radio. (Tr. 234.) According to Plaintiff, she never reads the newspaper and sleeps most of the day. *Id*. She admitted that she does not meet her occupational therapy goals. She stated that she could not concentrate or focus and that she does not drive often. She told the ALJ that she sometimes loses her car, forgets how to spell her name, and loses items in the house (such as her glasses). (Tr. 234-35.) She said that she does not shop without her husband and does not like talking on the phone. (*Id*.) She reported that she takes care of her personal hygiene when her husband reminds her. (*Id*.)

Plaintiff stated that she had the same problems when she was working, but the problems had gotten worse despite medication. She claims she quit her job of eighteen years because of

depression and lack of energy and because she heard voices.[2] (Tr. 238.) She stated that she still hears voices every day, and does not do housework because of lack of energy. (Tr. 245.)

Plaintiff's husband testified that he had been married to Plaintiff for eighteen years. He said that Plaintiff had not had mood swings during the preceding two years and that he assured her compliance with her medication regime. (Tr. 248.) He described erratic sleep behavior on Plaintiff's part and told about her panic attacks. (Tr. 248-50, 252.) He said that overall, Plaintiff does fairly well most of the time. (Tr. 252-53.) Plaintiff's husband does most of the cooking and cleaning although Plaintiff helps him. (*Id.*) He reminds her to take care of her personal hygiene. (Tr. 255.)

**IV**.

According to the ALJ, Plaintiff met the insured status requirements through the date of the decision, January 26, 2007, and did not engage in substantial gainful activity at any time after her alleged onset date. (Tr. 16.) The ALJ found that Plaintiff had severe impairments of diabetes, hypertension, otitis media, a depressive disorder, and obesity. (*Id.*) The ALJ described Plaintiff's history of noncompliance with medically prescribed treatment due to financial problems and thinking she no longer required medication and/or treatment. (*Id.*) The ALJ decided that Plaintiff demonstrated some sadness, lack of motivation, and loss of interest in activities, but retained a good appetite, made good eye contact, and showed fair insight and judgment. (Tr. 17.) The ALJ found that Plaintiff demonstrated the ability to relate well to others. She stated that "although she has a history of auditory hallucinations and paranoid delusions, she has not experienced mental health

---

[2] This statement is contradicted by a history Plaintiff gave to Dr. Sobiesk. Plaintiff told Dr. Sobiesk that she quit her long-time job because she had been subjected to sexual harassment. (Tr. 174.)

8

problems expected to preclude substantial gainful activity for any period lasting, or expected to last, for 12 continuous months during the alleged period of disability." (*Id*.) The ALJ concluded that "claimant's mental status has not significantly limited her ability to understand, remember, and carry out simple job instructions." (*Id*.)

The ALJ noted Plaintiff's history of failure to keep medical appointments and failure to comply with her prescribed medication regime. (*Id*.) At the time of her consultative examination in February 2005, she had not been taking her prescribed medication for diabetes for seven months and had not been taking her high blood pressure medication. Despite her lack of compliance, she did not appear to have any significant difficulty with sitting, standing, moving about, lifting or carrying objects, hearing, or speaking. (*Id*.) She "carried on a conversation very well." (*Id*., citing Ex. 3.) The ALJ considered Plaintiff's medical records from HFR for August 20, 2004 though May 18, 2005, and concluded that "although mental health symptoms were reported, the symptoms did not preclude work activity for any period lasting, or expected to last, for 12 consecutive months." The medical records showed that Plaintiff's condition improved with medication and counseling. (*Id*., citing Ex. 4F.)

The ALJ noted that the state agency doctors studied the medical reports and concluded that Plaintiff had the physical ability to perform a full range of medium work with only moderate limitations in mental health functioning. (*Id*., citing Ex. 6G and 7F.) With respect to Plaintiff's depressive symptoms, the ALJ considered the functional limitations imposed. (Tr. 18.) The ALJ concluded that Plaintiff's few activities were not indicative of her condition and that the record does not reflect more than moderate restrictions in the activities of daily living. (*Id*.) The ALJ found that Plaintiff "has not experienced major areas of mental functioning limited to a "marked" degree for

9

any period lasting, or expected to last, for at least 12 continuous months," and that "[s]he has not met or equaled a mental health listing at any time relevant to this decision." (*Id.*) The ALJ concluded that Plaintiff did not meet or medically equal any of the listings for an impairment or combination of impairments in 20 CFR Part 404, Subpart P, App. 1. (Tr. 18-19.)

The ALJ found that throughout the time period under review, Plaintiff had the residual functional capacity to perform the physical requirements of medium work, and that although she should not be expected to understand, remember, and carry out complex job instructions, she had retained the ability to understand, remember and carry out simple job instructions, and had remained capable of responding appropriately to coworkers and supervisors. (Tr. 19.) The ALJ did not find Plaintiff's testimony credible. The ALJ concluded that Plaintiff had been able to perform her unskilled past relevant work as a dietary aide, a janitor/housekeeper, and a cooks helper and that she had been able to perform other unskilled jobs existing in significant numbers in the national economy. Consequently, Plaintiff was not disabled under the Act. (*Id.*)

## V.

To be entitled to social security benefits a claimant must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant

is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. In this case, the Commissioner determined at step four that Plaintiff was not disabled.

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38

F.3d at 236. To make a finding of "no substantial evidence," the court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973)). Even if the court should determine that the evidence preponderates in the claimant's favor, the court must still affirm the Commissioner's findings if there is substantial evidence to support these findings. *See Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985). The resolution of conflicting evidence is for the Commissioner rather than for this court. *See Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

## VI.

### A.

Plaintiff argues that the ALJ's finding with respect to Plaintiff's mental residual functional capacity ("MRFC") is the result of reversible legal error and is not supported by substantial evidence. (Pl.'s Br. at 12.) Plaintiff relies upon the state agency psychological/psychiatric consultants who found Plaintiff "markedly" limited in the ability to interact appropriately with the general public, and "moderately limited in the abilities to: maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (Tr. 159-60). In a written narrative, the consultants stated that Plaintiff '[c]an understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept

12

instructions, & respond appropriately to changes in routine work setting." (Tr. 161.) Plaintiff claims the ALJ ignored these opinions and failed to explain what weight she gave them, as SSR 96-6p requires.

The Commissioner acknowledges that the ALJ did not specifically address each state agency physician's opinion. The Commissioner argues that the ALJ's MRFC finding reflects the limitations expressed by all of the physicians and the record as a whole supports the ALJ's decision. Accordingly, the Commissioner contends, the ALJ's failure to provide a lengthy analysis of each assessment is harmless and does not warrant a remand. Further, the Commissioner contends, the ALJ was not bound by the mental assessments performed by the non-examining state agency physicians, including the psychological/psychiatric consultant who reviewed Plaintiff's case.

RFC refers to the claimant's ability to do "sustained work-related physical and mental activities in a work setting on a regular or continuing basis," eight hours a day, for five days a week or an equivalent work schedule, despite any physical or mental impairments. SSR 96-8p; 20 C.F.R. § 404.1545(a). The ALJ has the responsibility to determine the claimant's RFC at the administrative hearing based on all of the evidence, including the medical records, observations of treating physicians and other acceptable medical sources, and the claimant's own description of her limitations. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). The ALJ must resolve conflicts in the evidence and make credibility determinations based on substantial evidence. *Lovelace v. Bowen*, 813 F.2d 55, 59-60 (5th Cir. 1987); *Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981) (per curiam). "The [proper] inquiry [] is whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

If the claimant's mental impairment is severe but does not meet or equal a Listing, the ALJ must assess the claimant's mental RFC. 404.1520a(d)(3). The mental RFC assessment requires consideration of an expanded list of work-related capacities, including the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers and customary work pressures in a work setting. *Wates v. Barnhart,* 274 F. Supp.2d 1024, 1036-37 (E.D. Wis. 2003) (citing SSR 85-16).

The Court "will not vacate a judgment unless the substantial rights of a party have been affected." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989). To determine whether the claimant had been prejudiced, the court examined the purpose behind S.S.R. 96-6p in *Hambrick v. Apfel*, 1998 WL 329368, at *3 (following the approach taken in *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. Unit A Sept. 1981)). One purpose for adopting the SSR was to emphasize the longstanding policy that an ALJ may not ignore the non-examining state agency opinions and must explain the weight given to them, citing SSR 96-6P. **AFTER RECOGNIZING THAT THE ALJ HAD NOT COMPLIED WITH S.S.R. 96-6P, THE *HAMBRICK* COURT REMANDED THE CASE BECAUSE IT COULD NOT DETERMINE WHETHER THE ALJ HAD NEVERTHELESS COMPLIED WITH THE PURPOSE BEHIND S.S.R. 96-6P. *ID*. THE *HAMBRICK* COURT'S REASONING IMPLIES THAT AN ALJ'S**

# VIOLATION OF A RULING DOES NOT AFFECT THE SUBSTANTIAL RIGHTS OF A CLAIMANT UNLESS THE ALJ ALSO FAILS TO ACCOMPLISH THE RULING'S UNDERLYING PURPOSE.

"Procedural improprieties . . . will . . . constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).

The non-examining state agency medical source, J. M. Chappuis, Ph.D., stated on March 28, 2005 that Plaintiff was "markedly" limited in the ability to interact appropriately with the general public, but that Plaintiff had only "moderate" or "no limitations" in 19 of the 20 mental criteria described in SSA Form SSA-4743. (Tr. 159-60.) Further, the state agency consultant stated that Plaintiff's depression was not so severe as to meet Listing 12.04 because she had no more than "moderate limitations in activities of daily living, maintaining social function, and maintaining persistence and pace. (Tr. 155.) He further found that Plaintiff "[c]an understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions and respond appropriately to changes in routine work settings." (Tr. 161.) He observed the Plaintiff did not always take her prescribed medications "due to money problems and thinking she no longer needs them when she begins to feel better." (Tr. 157.) Additionally, Dr. Chappius concluded that Plaintiff's "alleged limitations due to claimant's symptoms are not fully supported by the medical evidence."

The ALJ pointed out that the state agency psychologist noted that Plaintiff "has retained

intact memory, fair concentration, fair judgment and, despite some depression and fatigue occasionally affecting concentration, she has retained abilities for understanding, remembering and carrying out simple and detailed job instructions." The ALJ noted that the state agency doctors studied the medical reports and reported that Plaintiff had the physical ability to perform a full range of medium work with only moderate limitations in mental health functioning. The ALJ concluded, after reviewing the record, that "treating and examining doctors did not report objective findings that would disable the claimant . . ." and the "findings of non-examining State Agency physicians did not support the claimant's claim for benefits." (Tr. 20.) The ALJ did not, in contravention of the purpose of SSR 96-6p, ignore the state agency review physician's opinions, but took them into account. She erred by failing to explain the weight she gave to them, but this error does not cast into doubt the existence of substantial evidence to support the ALJ's decision. The ALJ's decision "is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). *See also Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision."). The ALJ incorporated into the hypothetical questions to the VE all of Plaintiff's disabilities supported by the evidence and recognized by the ALJ. The Court finds that the ALJ did not commit reversible legal error in determining Plaintiff's MRFC and that substantial evidence supports her decision that Plaintiff is not disabled.

Further, the ALJ did not commit error by not specifically indicating at step five of the sequential evaluation process that Plaintiff would be able to sustain any work she would obtain. This is not a case where the claimant experienced occasional symptom-free periods and a sporadic

ability to hold a job, which were symptomatic of her mental disability. *See Leidler v. Sullivan*, 885 F.2d 291, 292 n.3 (5th Cir. 1989) (citing *Poulin v. Bowen*, 817 F.2d 865, 875-76 (D.C. Cir. 1987)). Despite her mental problems, Plaintiff worked, for eighteen years for the same company. This was true despite the fact that her symptoms of seizures and hallucinations were more severe at an earlier time, and after she quit, most of her symptoms were controlled by medication and counseling. Plaintiff's point of error is overruled.

**B**.

Plaintiff also argues that the ALJ's MRFC findings is unsupported by substantial evidence, in that it results in significant part from a faulty credibility analysis. Plaintiff testified that her fatigue is so disabling that she sleeps anywhere from twelve to eighteen hours a day, every day. She testified that she smokes one and one-half packs of cigarettes a day. Her husband testified that she smokes two and one-half packs of cigarettes a day. Plaintiff testified that she occasionally goes shopping with her husband. Her husband testified that she does fairly well around people most of the time. He testified that they visit family and family visits them, that he and Plaintiff go out to eat once or twice a week, and that she helps him with the housework occasionally.

The ALJ stated that Plaintiff's "medically determinable impairments could have been reasonably expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms have not been credible." (Tr. 20). The ALJ observed that Plaintiff "appeared to be very rational and reality oriented during the hearing, and her testimony was indicative of a good memory." (Tr. 19.) The ALJ noted that "[a]lthough the claimant reported hearing voices, the evidence shows that such symptoms occurred when the claimant was non-compliant with her prescribed medication. (*Id*.) The ALJ also noted

17

that "[t]he claimant exercised good mental control when she demonstrated ability to lose weight as a means of controlling her diabetes." (*Id*.)  Further, the ALJ pointed out that "[a]lthough the claimant has admitted to few activities, the evidence shows that she has prepared meals, washed dishes, and driven an automobile occasionally.  (*Id*.)  Plaintiff provided information that "her physical problems have not limited her abilities for sitting, standing, lifting, carrying, using the hands, bending, kneeling, squatting, reaching, speaking, doing yard work, or gardening." (Tr. 20.) The ALJ found that these activities indicate a physical ability sufficient to perform the exertional requirements of many work-related tasks.  (*Id*.)  In this case, the ALJ fulfilled her obligation to consider Plaintiff's subjective complaints of disabling fatigue by considering and expressly rejecting--as unsupported and not credible--her contention that her mental condition precluded her from performing medium work.  *See Falco*, 27 F.3d at 163.  Substantial evidence supports the ALJ's credibility determination, and contrary to Plaintiff's assertion, the ALJ's explanation for the conclusion that Plaintiff was not entirely credible satisfies the requirements of SSR 96-7p.

Plaintiff faults the ALJ for concluding that plaintiff "exercised good mental control when she demonstrated [the] ability to lose weight as a means of controlling her diabetes."  Plaintiff says the only evidence that supports the ALJ's finding is Plaintiff's testimony that she weighed 193 at the time of the hearing.  To the contrary, the ALJ's analysis is supported by Plaintiff's medical records which the ALJ reviewed.  Plaintiff claimed she became disabled on July 15, 2004.  The medical records show that on February 25, 2005, six months later, Plaintiff weighed 208.8 pounds (Tr. 118) and on that date, she admitted to intentionally losing approximately 60 pounds of weight within the last six months (i.e., during the relevant period).

Moreover, the record does not show that Plaintiff was non-compliant with her prescribed

18

medications due to poverty. Plaintiff changed to HFC for psychiatric care because of financial considerations and thus was able to obtain psychiatric care and medications. At times, she was provided with samples. Plaintiff admitted that she was non-compliant with her group goals. Dr. Deneca suggested at one point that her excessive sleeping during the day might be due to boredom. The ALJ's credibility analysis was not based on an intangible or intuitive notion, but upon the record.

Plaintiff attacks the tenor of the ALJ's questions and comments at the hearing as indicating a fundamental misunderstanding of the nature of mental illness and its symptoms. The ALJ considered the record as a whole as not supporting Plaintiff's credibility, and the record as a whole provides substantial evidence to support the ALJ's determination that Plaintiff's functional capacity during the relevant period was greater than she indicated and sufficient for a full range of medium work. The ALJ did not misunderstand the nature of mental illness and did not err in a manner that warrants reversal.

## Conclusion

Plaintiff failed to prove that the ALJ applied an incorrect legal standard. Additionally, Plaintiff failed to show that substantial evidence does not support the ALJ's finding that Plaintiff is not disabled within the meaning of the Social Security Act. The Commissioner's decision is **AFFIRMED.**

IT IS SO ORDERED this 30th day of April, 2008.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE